CHAPIN FITZGERALD LLP
    Kenneth M. Fitzgerald, Esq. (SBN: 142505)
    kfitzgerald@cftriallawyers.com
    Douglas J. Brown, Esq. (SBN: 248673)
    dbrown@cftriallawyers.com
550 West "C" Street, Suite 2000
San Diego, California  92101
Tel:  (619) 241-4810
Fax:  (619) 955-5318

Attorneys for Plaintiff
Sophia & Chloe, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Sophia & Chloe, Inc.,**<br>   a California corporation,<br><br>                   Plaintiff,<br><br>   v.<br><br>**Brighton Collectibles, LLC,**<br>   a Delaware limited liability company,<br><br>               Defendant. | Case No.:   3:12-cv-02472-AJB (KSC)<br><br>**Plaintiff Sophia & Chloe, Inc.'s Memorandum of Points and Authorities in Opposition to Defendant Brighton Collectibles, LLC's  Motion for Summary Judgment, "or, in the Alternative, Summary Adjudication"**<br><br>Hearing Date:   June 26, 2014<br>Hearing Time:   2:00 p.m.<br><br>Location:<br>Edward J. Schwartz Courthouse<br>221 W. Broadway, Courtroom 3B<br>San Diego, CA  92101<br><br>Hon. Anthony J. Battaglia<br><br>Case Filed  October 11, 2012 |

1

# Table of Contents

2  I.   Introduction ................................................................................................ 1

3  II.  Facts .......................................................................................................... 3

4       A.   Sophia & Chloe Creates the Kiss Collection ..................................... 3

5       B.   Sophia & Chloe Invests in Establishing Trade Dress for
6            its Kiss Collection ............................................................................. 4

7       C.   Brighton Accesses the Kiss Collection, Then Copies It ..................... 5

8            1.   Brighton Examines the Kiss Collection and
9                 Creates Toledo ........................................................................... 5

10           2.   Brighton Suppresses Evidence of Ms. Cruser-
11                Scott's Access to Sophia & Chloe's Kiss Designs ..................... 7

12      D.   Joint Retailers Recognize Brighton's Theft and Brighton
             Employees Admit to the Similarities of the Collections ..................... 8

13 III. Argument .................................................................................................... 9

14      A.   Summary Judgment is Inappropriate to the Claims at
15           Issue .................................................................................................. 9

16      B.   There is Substantial Evidence of Brighton's Copyright
17           Infringement .................................................................................... 10

18           1.   Brighton Accessed the Kiss Collection Before
19                Designing Toledo ..................................................................... 11

20                a.   The Kiss Collection Was Widely Available to
21                     Kim Cruser-Scott ............................................................. 11

22                b.   The Kiss and Toledo Collections Are
                       Uncannily Similar ............................................................ 12

23                c.   Brighton Also Accessed Sophia & Chloe's
24                     Copyrighted Designs Under the Corporate
25                     Receipt Doctrine .............................................................. 12

26           2.   Substantial Similarity Is a Jury Question, as
27                Brighton Has Argued ................................................................ 13

28

a.    Brighton's Motion Misapplies the Extrinsic Test to Jewelry................................................... 14

C.    Sophia & Chloe's Trade Dress Claim Must Also Go To a Jury............................................................ 17

1.    Sophia & Chloe's Trade Dress Has Acquired Secondary Meaning.............................................. 19

2.    Brighton's Knock-Offs Are Not Only Likely to Cause Customer Confusion, They Already Have.................. 23

D.    Sophia & Chloe Can Still Recover Brighton's Profits as Damages......................................................... 24

E.    Each of Sophia & Chloe's Copyrights Lives Its Own Copyright Life.................................................. 25

V.   Conclusion.......................................................... 25

**Table of Authorities**

Page(s)

**Cases**

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,*
    280 F.3d 619 (6th Cir. 2002) ............................................................ 20

*Am. Scientific Chem., Inc. v. Am. Hosp. Supply Corp.,*
    690 F.2d 791 (9th Cir. 1982) ............................................. 19, 22, 23

*Apple, Inc. v. Samsung Elecs. Co., Ltd.,*
    920 F. Supp. 2d 1079 (N.D. Cal. 2013) .................................. 19, 20

*Art Attacks Ink, LLC v. MGA Entm't Inc.,*
    581 F.3d 1138 (9th Cir. 2009) ................................................ 11, 18

*Baxter. v. MCA, Inc.,*
    812 F.2d 421 (9th Cir. 1987) .................................................. 12, 15

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg., Inc.,*
    Case No. 10-CV-000419-GPC-WVG (S.D. Cal.) .......................... 13

*Brighton Collectibles, Inc. v. Coldwater Creek, Inc.,*
    Case No. 06-CV-01848-H-POR (S.D. Cal.) ................................... 10

*Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,*
    973 F.2d 1033 (2d Cir. 1992) ....................................................... 18

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.,*
    489 F.3d 1129 (11th Cir. 2007) ................................................... 14

*Cavalier v. Random House, Inc.,*
    297 F.3d 815 (9th Cir. 2002) .................................................. 14, 15

*Clicks Billiards Inc. v. Sixshooters Inc.,*
    251 F.3d 1252 (9th Cir. 2001) ................................................ 18, 19

*Cont'l Lab Prods., Inc. v. Medax Int'l, Inc.,*
    114 F.Supp. 2d 992 (S.D. Cal. 2000) ........................................... 19

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,*
    259 F.3d 1186 (9th Cir. 2001) ..................................................... 25

*Cosmos Jewelry Ltd. v. Po Sun Hon Co.,*
    470 F. Supp. 2d 1072 (C.D. Cal. 2006) .............................. 18, 19, 22

*Cosmos Jewelry, Ltd. v. Po Sun Hon Co.*,
    Case No. 06-56338, 2009 WL 766517, at *2 (9th Cir. Mar. 24, 2009)........... 23

*Country Kids 'N City Slicks, Inc. v. Sheen*,
    77 F.3d 1280 (10th Cir. 1996) ...................................................... 15

*Dawn Assocs. v. Links*,
    203 U.S.P.Q. 831 (N.D. Ill. 1978) ................................................. 15

*Dreamwerks Prod. Group v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ...................................................... 23

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ...................................................... 15

*Gable v. Nat'l Broad. Co.*,
    727 F. Supp. 2d 815 (C.D. Cal. 2010) ............................................. 12

*Hamil Am., Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999) .......................................................... 16

*Heim v. Universal Pictures Co.*,
    154 F.2d 480 (2d Cir. 1946) ........................................................ 15

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ........................................................ 9

*LA Printex Industries, Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012) ............................................... 9, 11, 16

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) .................................................. 9, 23

*Marchel Design, Inc. v. Best Master Enters., Inc.*,
    2008 WL 4723113, at *35 (No. CV 08-03654 DOC C.D. Cal. Oct.
    23 2008)................................................................................ 16

*Mattel Inc. v. Walking Mt. Prods.*,
    353 F.3d 792 (9th Cir. 2003) ...................................................... 18

*McCulloch v. Albert E. Price, Inc*,
    823 F.2d 316 (9th Cir. 1987) ...................................................... 15

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) .................................................... 13

*Playboy Enters., Inc. v. Netscape Comm'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004) ............................................................ 9

*Robertson v. Patten, Barton, Durstive & Osborn, Inc.*,
146 F. Supp. 795 (S.D. Cal. 1956) .................................................... 15

*Samara Bros., Inc. v. Wal–Mart Stores, Inc.*,
165 F.3d 120 (2d Cir. 1998) ............................................................. 24

*Samara Bros., Inc. v. Wal–Mart Stores, Inc.*,
529 U.S. 205 (2000) .......................................................................... 24

*Segrets, Inc. v. 27 Gillman Knitwear Co.*,
207 F.3d 46 (1st Cir. 2000) ............................................................. 16

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ........................................................... 14

*Tenn. Fabricating Co. v. Moultrie Mfg. Co.*,
421 F.2d 279 (5th Cir. 1970) ........................................................... 16

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) .................................................. 11, 13

*Vision Sports, Inc. v. Melville Corp.*,
888 F.2d 609 (9th Cir. 1989) ........................................................... 22

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000) .......................................................................... 19

*Walt Disney Co. v. Powell*,
897 F.2d 565 (D.C. Cir. 1990) ......................................................... 25

*Worth v. Selchow & Righter Co.*,
827 F.2d 569 (9th Cir. 1987) ........................................................... 15

*Yurman Design, Inc. v. PAJ, Inc.*,
262 F.3d 101 (2d Cir. 2001) ............................................................. 16

**Other Authorities**

1 McCarthy,
McCarthy on Trademarks (4th ed. 2013) ................................ 18, 24

R. Osterberg & E. Osterberg,
Substantial Similarity in Copyright Law § 10:4 (2013) ................... 17

# I.   Introduction

Here are the primary pieces of jewelry at issue in this case:



Doc. No. 35-4 ¶ 13.  Brighton asks the Court (instead of a jury) to declare (as a matter of law) that its Toledo Collection does not infringe on Sophia & Chloe's copyrights and trade dress because these pieces are not substantially similar or likely to generate customer confusion as to their source.  But as the side-by-side comparison above lays bare, the collections are strikingly similar.  This uncanny similarity between the Toledo and Kiss designs is not the bizarre coincidence or organic outgrowth of a trend in Moroccan design, as Brighton would have this Court believe.  Substantial evidence shows it to be the result of Brighton copying the Kiss collection, then prevaricating in its denials of doing so.  Summary judgment must be denied.

Access plus substantial similarity proves infringement, and the evidence of Brighton's access is overwhelming.  First, Brighton's founder and CEO, Jerry Kohl, who is actively involved in the design process at Brighton, signed up to receive Sophia & Chloe's marketing emails on November 24, 2009 (two years before Brighton designed its Toledo pieces).  He opened dozens of those emails (which contained images of and references to the Kiss collection) before Brighton's Toledo collection ever came into existence.  He frequented numerous prominent boutiques where Sophia & Chloe's Kiss collection was sold.  And he forwarded pictures of Sophia & Chloe designs to other Brighton personnel.  Second, Brighton and Sophia & Chloe are sold in the same stores, rendering it implausible that Brighton was not aware of the Kiss collection it was competing against through those retailers.  Finally, the pictures of bowl and ceiling art designs that Brighton designer Kim Cruser-Scott claims as the inspiration for the Toledo pieces look nothing like the Toledo pieces themselves (Brighton suppressed the evidence of when those pictures were created or received by Ms. Cruser-Scott, casting even more serious doubt on the veracity of her story).

There is abundant circumstantial evidence of Ms. Cruser-Scott's access to Sophia & Chloe's Kiss designs from which a jury could reasonably infer Brighton deliberately copied those well-known designs.  This evidence and Brighton's suppression of the best evidence of her access raise triable issues of fact regarding Ms. Cruser-Scott's access to the Kiss designs.  Brighton's motion fails insofar as it is based on the denial that Ms. Cruser-Scott directly copied.

Brighton's motion also fails insofar as it is based on the claimed lack of substantial similarity in protected expression.  The entire copyrighted shapes of the Kiss collection constitute protectable expression.  A combination of otherwise unoriginal expressions warrants copyright protection when it demonstrates originality and creativity, which is the case here.  Brighton advocates an incorrect standard of analysis for jewelry designs that the Ninth Circuit has abandoned.

Under the correct legal standard for works of visual art like jewelry, which involves examining the overall appearance of the designs for confusing similar appearance, the question of substantial similarity presents at least disputed issues of fact, which only a jury can decide.

The Court should also deny Brighton's motion regarding as to the trade dress claim because there is sufficient evidence of the distinctiveness and secondary meaning in Sophia & Chloe's designs plus meaningful evidence of actual consumer confusion as to the source of those designs, from which a jury could reasonably conclude that Brighton infringed Sophia & Chloe's trade dress. Finally, the Court should deny Brighton's request to limit Sophia & Chloe's remedies because Sophia & Chloe is still entitled to recover Brighton's profits as a measure of "actual damages" and because each of Sophia & Chloe's 13 registered copyrights is capable of living its own copyright life.

## II.   Facts

### A.   Sophia & Chloe Creates the Kiss Collection.

Nathalie Sherman is the founder, co-owner, and operator of Sophia & Chloe, Inc., a San Diego based company that designs, distributes, and sells original and distinctive jewelry and accessories for women.  Sherman Dec. ¶ 2. Ms. Sherman, who was born in Morocco, started designing jewelry in 1996.  *Id.* Her distinctive Sophia & Chloe jewelry brand, named after her two daughters, contains symbolic elements, often drawn from her heritage.  *Id.* ¶¶ 2-3.  For Sophia & Chloe's Kiss collection, Ms. Sherman drew inspiration from Moroccan Henna tattoos, where she found a bracket shape – { –  she had seen henna tattoo artists refer to as a "kiss."  *Id.* ¶ 3; *id.* ¶ 19 Exh. J ("Sherman Depo. I") at 35:21-42:25.  Ms. Sherman saw that the shape is also a "brace," which means essentially "to belong together," and decided to use it as the basis for her collection.  *Id.* ¶ 3.

Ms. Sherman sketched out many possible designs using the bracket shape and had molds made of the same.  Sherman Dec. ¶ 4, Exh. A.  After extensive

1    trial-and-error, she found the perfect arrangement for a set of earrings, necklaces,

2    and a bangle in 2007, as she did again in 2010 when she added the Buddha's Kiss

3    design to the collection.  *Id.* ¶ 5.  Also in 2010, Ms. Sherman received 13

4    copyrights on the designs.  Sherman Dec. ¶ 7; Exh. B.  An expert in jewelry and

5    design attests that she had never seen the Kiss designs in jewelry before; that the

6    designs were "unique-looking" and "stylized"; and that she had not found

7    anything with "the symbols put together in the sizes and shapes and creativity

8    that the Sophia & Chloe work has."  Fitzgerald Dec. ¶ 10, Exh. G ("Groover-

9    Maydahl Depo.") at 38:25-44:6; *Id.* ¶ 15, Exh. L at 5 (the "Sophia & Chloe

10    jewelry designs were unique and original in the jewelry design universe at the time

11    they were created and first sold by Sophia & Chloe.").

12    **B.  Sophia & Chloe Invests in Establishing Trade Dress for its Kiss Collection**

13           Through its marketing efforts, Sophia & Chloe invests heavily in

14    establishing the trade dress for its Kiss collection in the marketplace.  Sophia &

15    Chloe has distributed tens of thousands of post cards, promotional brochures, and

16    catalogs to wholesale and retail customers; constantly promotes its products to

17    thousands of subscribers through regular email blasts; and solicits customers

18    through its social media presence, including Facebook, Twitter, Polyvore, and

19    Pinterest.  Ansolabehere Dec. ¶¶ 5-7, 11-14, Exhs. C-G, J-M; Sherman Dec. ¶

20    19, Exh. K ("Sherman Depo. II") at 48:3-49:4.  It has also exhibited its Kiss

21    collection at over 40 industry trade shows in New York, Los Angeles, and San

22    Francisco, and runs advertisements for its Kiss collection in numerous prominent

23    publications.  Ansolabehere Dec. ¶¶ 3-4, Exhs. A-B; Sherman Depo. II at 48:3-

24    49:4, 52:3-21, 53:4-54:4, 54:11-16.  Sophia & Chloe's Kiss collection jewelry is

25    sold on prominent e-commerce websites including Amazon.com, Opensky.com,

26    and Myhabit.com; its own website received over 300,000 page views from other

27    31,000 unique visitors between March 2012 and April 2014.  Ansolabehere Dec.

28    ¶¶ 9-10, Exhs. H-I.  Retailers also purchase magazine advertisements and post

announcements through their own email bulletins and social media accounts that identify the Kiss collection to customers.  Sherman Depo. II at 51:15-52:2.

The fruit of these efforts to build awareness around the Kiss collection and its associated styling is evident from the myriad editorial references to the Kiss collection in prominent national publications.  Sherman Dec. ¶ 13, Exhs. D-E.  The extent to which the high-end jewelry market had developed an awareness of and affinity for Sophia & Chloe's Kiss collection – before Brighton's Toledo knock-offs even hit the market – is further evident based on the many celebrities the company spotted wearing its Kiss jewelry during national media appearances.  *Id.* ¶ 14, Exh. E.  Prominent jewelry bloggers also promote the Kiss collection, further associating its trade dress with Sophia & Chloe.  Ansolabehere Dec. ¶ 15.

**C.  Brighton Accesses the Kiss Collection, Then Copies It.**

**1.  Brighton Examines the Kiss Collection and Creates Toledo.**

Despite its denials, Brighton indisputably accessed the Kiss collection long before it created its knock-off Toledo collection.  Sophia & Chloe advertises to its clients through email newsletters that often feature the Kiss collection.  Brighton's founder, owner, and president (Jerry Kohl) subscribed himself to Sophia & Chloe's mailing list on November 24, 2009.  *See* Fitzgerald Dec. ¶ 7, Exh. D ("Kohl Depo.") at 49:14-52:4; Exhs. 105-110.  In Spring 2012, Mr. Kohl forwarded some of these emails to Brighton's design director, asking to "discuss earrings," and to Brighton's social-media consultant.  Between April and October 2012, he opened at least 12 emails Sophia & Chloe sent that featured products in the Kiss collection at least 174 times.  Ansolabehere Dec. ¶ 8, Exh. F.

Before Brighton created its Toledo collection, Mr. Kohl shopped "many times" at small boutiques that prominently display the Kiss collection.  Kohl Depo. at 29:1-36:15.  Mr. Kohl regularly looks, and wants his designers to look, at competitors' jewelry designs wherever they go.  *Id.* at 65:3-11, 78:2-21.  Since 2010, Mr. Kohl also received *Accessories* magazine, a leading trade publication that

1   has repeatedly featured the Kiss collection.  Kohl Depo. at 75:22-77:1; Sherman

2   Dec. ¶ 13, Exh. E.  And Ms. Cruser-Scott's direct supervisor, design director

3   Monica Kostelnik, was aware of the Kiss collection, having received at least one

4   of Sophia & Chloe's marketing emails from Mr. Kohl.  Kohl Depo. at 61:24-

5   64:8, Exh. 107; *see also* Fitzgerald Dec. ¶ 13, Exh. I.

6       Although Ms. Cruser-Scott claims she never heard of Sophia & Chloe or

7   the Kiss collection before this lawsuit, she communicates with Ms. Kostelnik

8   daily and shows Mr. Kohl designs for his consideration.  Kohl Depo. 13:23-

9   14:14; 15:17-17:2.  Mr. Kohl regularly gives designers ideas for collections.  *Id.* at

10  66:23-67:8; Fitzgerald Dec. ¶ 4, Exh. A ("Cruser-Scott Depo.") at 31:3-32:14.

11  Mr. Kohl and Ms. Cruser-Scott also "communicated regarding the design and

12  creation of the [Toledo collection] through a face-to-face conversation and a

13  telephone call."  Fitzgerald Dec. ¶ 13, Exh. K at 3:2-12.  And both Mr. Kohl and

14  Ms. Kostelnik decide what designs go to market.  Kohl Depo. at 66:23-67:8; *see*

15  *also id.* at 11:5 – 12:6; Cruser-Scott Depo. at 81:21-83:7, 96:5-7.

16      Above all, it is Mr. Kohl's directive that all of his designers stay current on

17  trends in the marketplace through retail shopping, reviewing magazines, trade

18  shows, and similar activities.  Kohl Depo. at 77:24- 79:1.  Ms. Cruser-Scott does

19  all those things.  Cruser-Scott Depo. at 26:18-22; 26:23-27:14; 19:11-20:4,

20  27:15-18, 28:9-19; 27:22-28:8 (review magazines, **including *Accessories***

21  ***magazine***); 28:24-29:16.  Of the two people Brighton identified in its written

22  discovery responses with knowledge of the design of Toledo, Mr. Kohl

23  indisputably had already examined Sophia & Chloe's Kiss collection by the time

24  Brighton designed its Toledo collection, and it is implausible that Ms. Cruser-

25  Scott had not also viewed it.  Fitzgerald Dec. ¶ 14, Exh. J at 3:2-13; *id.* ¶ 12,

26  Exh. H at 2:1-19.  Though Brighton did not identify her in its interrogatory

27  responses or initial disclosures, Sophia & Chloe learned through discovery that

28  Monica Kostelnik – Brighton's design director and Ms. Cruser-Scott's supervisor

1   – also viewed the Sophia & Chloe collection before participating in the Toledo

2   collection's design (as evidenced by Sophia & Chloe emails forwarded to her from

3   Mr. Kohl, which Brighton did not produce until later in discovery).  Fitzgerald

4   Dec. ¶ 13, Exh. I.

5
6   **2.   Brighton Suppresses Evidence of Ms. Cruser-Scott's Access to Sophia & Chloe's Kiss Designs.**

7           As detailed in Sophia & Chloe's pending discovery motion (Doc. No. 35),

8   Brighton did not produce any emails between Mr. Kohl and Ms. Cruser-Scott.

9   Brighton did not preserve, search for, or produce the Internet histories of Ms.

10  Cruser-Scott and Mr. Kohl.  Brighton also did not produce emails between Ms.

11  Cruser-Scott and the manufacturer of the Toledo samples, or between her and

12  Monica Kostelnik, despite Mr. Kohl's admission that Ms. Cruser-Scott and Ms.

13  Kostelnik likely communicate daily.  Doc. No. 31-1 at 3:3-14; Doc. No. 35-4 at

14  8:8-9:12; Kohl. Depo. at 13:23-14:1.  Brighton conducted its email search using a

15  limited set of search terms, configured so as to virtually guarantee that relevant

16  emails would not be found.  So while Sophia & Chloe does not have "smoking

17  gun" evidence directly demonstrating Ms. Cruser-Scott's knowledge of Sophia &

18  Chloe's designs, that is because Brighton hid that evidence or let it be destroyed

19  after being put on notice of Sophia & Chloe's claim.

20          The circumstantial evidence of Ms. Cruser-Scott's access is abundant and

21  includes her implausible version as to her design of the Toledo pieces.  According

22  to her testimony, these three images were her inspiration for that collection:

23
24
25  
26
27
28

Cruser-Scott Depo. at 103:6-104:7, Exh. 88.  Brighton did not produce any electronic version of these pictures that would contain metadata showing when the pictures were actually created and/or viewed.  Brighton also refused to produce Ms. Cruser-Scott's internet history (which would likely show her viewing Sophia & Chloe's website), claiming it does not exist, even though it can likely be recovered through computer forensics inspection.  *See* Doc. No. 35-6.

In sum, even without direct evidence of Ms. Cruser-Scott actually copying the Kiss designs (evidence rarely obtained in these cases), the undisputed facts are: (1) Mr. Kohl repeatedly accessed and Ms. Kostelnik also viewed the Kiss collection; (2) both regularly discussed designs with Ms. Cruser-Scott; (3) Mr. Kohl requires his designers to monitor the market, which Ms. Cruser-Scott does; (4) Ms. Cruser Scott and Mr. Kohl received *Accessories* magazine, which featured the Kiss designs; and (5) Mr. Kohl chose the pieces that would be in the Toledo collection.  From these facts alone, a jury could reasonably infer what is already apparent from the side-by-side pictures of the Kiss and Toledo pieces: Ms. Cruser-Scott saw (and copied) Sophia & Chloe's jewelry designs.[1]

**D. Joint Retailers Recognize Brighton's Theft and Brighton Employees Admit to the Similarities of the Collections.**

---

[1] Ms. Cruser-Scott's sketches also contain two other designs that are blatant knock-offs of Kiss collection jewelry but that Brighton ultimately chose not to manufacture.  Sherman Dec. ¶ 15, Exh. F.  Brighton further revealed it had viewed and copied the Kiss collection when it parroted the rarely used (at the time) word "arabesque" from Sophia & Chloe's marketing with its own announcements regarding the Toledo collection in the late summer of 2012.  *Compare id.* ¶ 16, Exh. H (Brighton advertising of August 2012 touting "more arabesque flourishes" and "arabesque shapes"), *with id.* ¶ 16, Exh. G (Sophia & Chloe website referencing "each tiny arabesque" of Kiss collection jewelry).

Individuals familiar with both companies and product lines immediately recognized that the Toledo collection was a copy of Sophia & Chloe's Kiss collection.  Sherman Depo. II at 61:11-63:21; Kohl Depo. 115:23-116:21; Sherman Dec. ¶ 9, Exh. C.Fitzgerald Dec. ¶ 5, Exh. B ("Paloutzian Depo.") at 98:25-99:21.  Brighton's own sales representative admitted that the collections have many similarities.  *Id.* at 121:14-126:24.  So did Ms. Cruser-Scott.  Cruser-Scott Depo. at 125:21-126:8; 147:11-148:10.  The Brighton executive in charge of photographing the company's pieces for its website saw and touched a physical Sophia & Chloe Kiss bangle before mistaking it for Brighton's Toledo collection knock-off.  Fitzgerald Dec. ¶ 6, Exh. C ("Cable Depo.") at 24:8-25:14; Exh. 92.  Brighton customers have confused Sophia & Chloe as the source of the Toledo designs.  Sherman Depo. 104:5-18 (confusion of retailer's general manager), 108:16-109:15 (confused customer at Montage Beverly Hills), 113:14-114:6 (confused customer in Bloomingdale's).  Even Mr. Kohl admitted, "if I would have got a simple phone call [from Nathalie Sherman] that said: 'I'm an independent artist, please don't copy my things'.  We wouldn't have [continued to sell the Toledo collection]."  Kohl Depo. at 145:22-148:24.

## III. Argument

### A.  Summary Judgment Is Inappropriate to the Claims at Issue.

"Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (9th Cir. 1999).  "Summary judgment is 'not highly favored' on questions of substantial similarity in copyright cases." *LA Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 847-48 (9th  Cir. 2012).  Likelihood of confusion and whether a trade dress has acquired secondary meaning are also questions of fact.  *Playboy Enters., Inc. v. Netscape Comm'ns Corp.*, 354 F.3d 1020, 1027 (9th Cir. 2004) (likelihood of confusion); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985 (secondary meaning).

**B.  There is Substantial Evidence of Brighton's Copyright Infringement.**

It is undisputed that Sophia & Chloe was first to create the designs in its Kiss collection.  There is sufficient creativity in those designs to satisfy the minimal originality requirement under copyright law.  Brighton accessed Sophia & Chloe's designs and then produced its Toledo collection, featuring designs that are almost identical.  Sophia & Chloe's copyright claims should thus go to a jury.

In addition to claiming it lacked access to the Kiss collection, Brighton also challenges the scope of the Sophia & Chloe's copyright protection, arguing that the shapes within the Kiss collection are not protectable because they are comprised of elements in the public domain.  But Brighton has refuted these very arguments in the past, including over the past year in other cases pending in this District.  *See* Fitzgerald Dec. ¶ 17, Exhs. N-O.  For example, Brighton articulated the correct way to view an unprotectable elements argument:

> **The copyrights at issue here are far from factual compilations or renditions of specific natural objects. They are "artistic works" that must be accorded "broader protection." [citations].  Both of the Brighton designs are intricate and detailed pieces that required extensive creative choice. . . .**

> **Coldwater, however, argues that scrolls and hearts have been around for centuries and presents the Court with myriad different heart-based and scroll designs. . . . Brighton's Carolina Heart is far more than the most basic idea of a heart and its Brighton Scroll is far more than the most basic idea of a scroll. . . .  Coldwater's evidence of various expressions of hearts and scrolls actually proves Brighton's point.  Although the ideas of hearts and scrolls have been around for centuries, artists throughout that time have added their own creative expressions to those ideas.**

*Id.* ¶ 17, Exh. N at 22:6-23:1 (Brighton's opposition to defendant's motion for summary judgment in *Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, Case No. 06-CV-01848-H-POR (S.D. Cal.)).  The designs in the Sophia

& Chloe Kiss collection similarly "required extensive creative choice," and Brighton's argument as to "myriad different" arabesque designs should not preclude Sophia & Chloe from presenting its case to a jury.  Brighton and its lawyers only scrounged up those designs *after* Brighton was caught infringing; they were not materials it relied on or even saw before it claims it independently created its knock-offs.  Kohl Depo. at 136:6-10, 136:17-22.

### 1.  Brighton Accessed the Kiss Collection Before Designing Toledo.

As discussed *supra*, section II.C.1, by Brighton's own admissions, high-level Brighton executives involved in the design process accessed the Kiss collection.  On these facts alone, Brighton accessed the collection.  This access gives rise to a "reasonable possibility" that Ms. Cruser-Scott also accessed the Kiss collection, and provides sufficient circumstantial evidence to raise a triable issue of fact for the jury.  *See Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009).

### a.  The Kiss Collection Was Widely Available to Kim Cruser-Scott.

Proof of access is satisfied if the defendant had "**an opportunity** to view or to copy plaintiff's work."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (emphasis added).  If the plaintiff's work has been "widely disseminated," the plaintiff has met its burden to present evidence of access.  *Id*. Brighton preemptively argues that the Kiss collection was not disseminated widely enough to meet this standard.  Doc. No. 46 at 19:11-23.  A recent Ninth Circuit opinion holds otherwise.  In *LA Printex*, the Court held that the sale of the plaintiff's copyrighted design in the same geographic marketplace as the infringer showed access.  676 F.3d at 847-48.  The "evidence required to show widespread dissemination will vary from cases to case," giving rise to a triable issue as to widespread dissemination.  *Id*.

Indeed, the Kiss collection has been in many of the same stores that sell Brighton goods since 2007 (including those that Jerry Kohl frequents); it has been

1   featured in trade publications widely disseminated in the industry; and it has been

2   prominently displayed on Sophia & Chloe's public website since 2007 and

3   available for purchase on public e-commerce website since 2009.  There is at least

4   a reasonable possibility – if not a near certainty – that Ms. Cruser-Scott had the

5   opportunity to access (and did) the Kiss collection before designing Toledo.

### b.  The Kiss and Toledo Collections Are Uncannily Similar.

7   Even if there were no evidence of access, the striking similarity between the

8   designs would give rise to a permissible inference of copying.  *See Baxter v. MCA,*

9   *Inc.*, 812 F.2d 421, 423 (9th Cir. 1987).  As the side-by-side picture that opens

10  this brief reveals, the collections are nearly identical.  A jury could reasonably (and

11  will) find that the Toledo collection could not have been the product of

12  independent creation or coincidence.

### c.  Brighton Also Accessed Sophia & Chloe's Copyrighted Designs Under the Corporate Receipt Doctrine.

15  Where there is no dispute that individuals within a corporation received

16  images of the copyrighted designs, that receipt creates a triable issue of fact as to

17  access by the actual designer if there is a "sufficient nexus between the individual

18  who possesses knowledge of a plaintiff's work and the creator of the allegedly

19  infringing work." *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal.

20  2010).  The nexus is sufficient if the person receiving the designs "(1) has

21  supervisory responsibility for the allegedly infringing project, (2) contributed ideas

22  and materials to it, or (3) worked in the same unit as the creators." *Id.*  All three

23  are true here with respect to Mr. Kohl and Ms. Kostelnik.[2]

---

25  [2] While Brighton may deny that Mr. Kohl and Ms. Kostelnik contributed ideas
        and materials to the Toledo collection's design, there is at least a triable
26      question of fact on this issue.  Mr. Kohl admitted as much earlier in this case
        when he swore that he is "personally involved with the design of Brighton's
27      products" and that he "personally approve[s] all designs for Brighton's

1

**2. Substantial Similarity Is a Jury Question, as Brighton Has Argued.**

2       Jurors should decide whether works of visual art are substantially similar.

3  As Brighton recently explained in another copyright case in this District:

4          **The question of substantial similarity is considered ill-**
           **suited to resolution by summary judgment. . . .**
5          **[S]ummary judgment is appropriate only "if the court**
           **can conclude, after viewing the evidence and drawing**
6          **inferences in a manner most favorable to the non-**
           **moving party, that no reasonable juror could find**
7          **substantial similarity of ideas and expression" . . .**
8          **[citation].**

9

10  Fitzgerald Dec. ¶ 17, Exh. Q at 6:9-18 (Brighton's opposition to defendant's

11  motion for summary judgment in *Brighton Collectibles, Inc. v. RK Texas Leather*

12  *Mfg., Inc.*, Case No. 10-CV-000419-GPC-WVG (S.D. Cal.)).

13       Jurors should also decide substantial similarity under the extrinsic/intrinsic

14  test Brighton describes.  As Brighton quoted in that other case, it is "well settled

15  that a jury may find a combination of unprotectable elements to be protectable

16  under the extrinsic test [where] the over-all impact and effect indicated

17  substantial appropriation."  *Id.* at 6 n.3 (citing *Three Boys Music Corp. v. Bolton*,

18  212 F.3d 477, 485 (9th Cir. 2000) (citations and quotations omitted); *Metcalf v.*

19

20

_____

21  products before they are manufactured."  Doc. No. 15-2.  Sophia & Chloe was
22  not able to depose Ms. Kostelnik because Brighton did not disclose her role
    and identity until late in discovery.  But it is inconceivable that Ms. Kostelnik
23  was not involved in the Toledo design in light of Mr. Kohl's testimony that
24  she and Ms. Cruser-Scott probably communicate daily, and the emails she
    exchanged with Mr. Kohl regarding Sophia & Chloe.  Kohl Depo. at 13:23-
25  14:1, 61:24-64:8, Exh. 107; Fitzgerald Dec. ¶ 13, Exh. I.  At a minimum, a
26  trier of fact could infer that Ms. Kostelnik knew of the Toledo designs given
    that she manages 12 different designers and must know what each is working
27  on in order to ensure their projects are distinctly different from one another.
28

1    *Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002)).  Brighton was correct then, and it

2    is judicially estopped from taking the contrary position it advocates now.

3             **a.  Brighton's Motion Misapplies the Extrinsic Test to Jewelry.**

4          While Brighton partially quotes case law describing the extrinsic test for

5    substantial similarity, it omits the important caveat that this test is difficult, if not

6    impossible, to apply to works like jewelry.  The essence of the test is that **ideas**

7    cannot be copyrighted, only the **unique expression of those ideas**.  *Swirsky v.*

8    *Carey*, 376 F.3d 841, 845 n.4 (9th Cir. 2004).  Under the extrinsic test, totally

9    unoriginal elements of a copyrighted work are not protected, like historical facts,

10   basic shapes (circles, squares, rectangles), or what an animal or plant looks like.

11   *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822-23 (9th Cir. 2002).

12         This test is easy enough to apply to a script (e.g., the story of two people

13   falling in love, breaking up, and getting back together is totally unoriginal) or a

14   painting (e.g., mountains capped with snow are not original).  But for abstract

15   works of visual art like jewelry designs, what is the underlying idea?  There isn't

16   one.  This is why the Ninth Circuit Jury Instructions Committee formally

17   withdrew the instruction regarding the extrinsic/intrinsic test and offered

18   replacement tests for substantial similarity of the type of works at issue here.  *See*

19   Ninth Circuit Manual of Civil Jury Instructions, 17.17.  For such works, *Cavalier*

20   provides the proper test.  *Id.* (citing *Cavalier*, 297 F.3d at 826).  Under *Cavalier*,

21         [A] court looks to the **similarity of the objective details in**

22         **appearance**.  [citation].  Although we do not attempt here to
      provide an exhaustive list of relevant factors for evaluating art

23         work, the subject matter, shapes, colors, materials, and

24         arrangement of the representations may be considered in
      determining objective similarity in appearance.

25

26   *Id.* (emphasis added).  The Ninth Circuit affirmed this standard: "Concluding

27   that the [works] are **confusingly similar in appearance** is tantamount to finding

28

substantial similarities in the objective details of the [works]." *See McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 319 (9th Cir. 1987) (emphasis added).

As this test implies, two works do not need to be exactly the same to be "substantially similar." *See BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1148 (11th Cir. 2007). There only need be "sufficient congruence between the original elements of the copyrighted work and the copied work such that a jury could find infringement." *Id.*; *see also Cavalier*, 297 F.3d at 826. "The touchstone of the analysis is the 'overall similarities rather than the minute differences between the two works.'" *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996). Where, as here, there are "striking similarities" in the details of the subject matter, even though differences in certain elements, exist, summary judgment should be denied. *Cavalier*, 297 F.3d at 827; *see also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997) (purported parody of Dr. Seuss's Cat in the Hat was substantially similar to original under both the objective and subjective tests, despite obvious differences, because defendants appropriated the work's "central character").

Courts have also repeatedly concluded that **entire** works need not be substantially similar to satisfy the test. "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter v. MCA, Inc.*, 812 F.2d 421,425 (9th Cir. 1987); *see also, e.g., Worth v. Selchow & Righter Co.*, 827 F.2d 569, 570 n.l (9th Cir. 1987); *Heim v. Universal Pictures Co.*, 154 F.2d 480, 488 n.9 (2d Cir. 1946) (line of a poem); *Dawn Assocs. v. Links*, 203 U.S.P.Q. 831 (N.D. Ill. 1978) (tag line for a movie); *Robertson v. Patten, Barton, Durstive & Osborn, Inc.*, 146 F. Supp. 795, 798 (S.D. Cal. 1956) (two bars of a song).

Substantial similarity may also be found where a plaintiff's work consists of a combination of elements—even common and unprotectable elements— arranged in a manner that a defendant then emulates, as Brighton did. *E.g., L.A.*

*Printex*, 676 F.3d at 852 (substantial similarity in two textile designs comprised of bouquets of flowers and branches where the "shape and number of the flower petals and leaves are similar in the two designs" and "[t]he two types of bouquets are arranged at similar angles in both designs, and the bouquets and branches are coordinated in similar spatial combinations on a grid of similar scale and layout"); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) (holding that jewelry was copyrightable based on the way plaintiff combined silver, gold, twisted cable, and colored stones, even though none of those elements were themselves copyrightable); *Hamil Am., Inc. v. GFI*, 193 F.3d 92,102-03 (2d Cir. 1999) (finding substantial similarity between fabric patterns consisting of clusters of flowers and leaves because defendant "duplicated Hamil America's selection of clustered flowers and leaves, its coordination of these elements in particular spatial combinations, and its arrangement of these design elements").

    And a defendant may not avoid liability by pointing to minor changes it made to a plaintiff's design or to such differences like the color of the two works. *E.g.*, *Segrets, Inc. v. 27 Gillman Knitwear Co.*, 207 F.3d 46, 62 (1st Cir. 2000) (changing colors); *L.A. Printex*, 676 F.3d at 28 851 (that defendants' "design does not use multiple shades of color" does not establish lack of substantial similarity); *see also Tenn. Fabricating Co. v. Moultrie Mfg. Co.*, 421 F.2d 279, 284 (5th Cir. 1970) (defendants' act of "adding four intercepting straight lines in the form of a diamond to [plaintiff's] filigree pattern" for decorative screen or room divider did not preclude finding of infringement); *Marchel Design, Inc. v. Best Master Enters., Inc.*, 2008 WL 4723113, at *35 (No. CV 08-03654 DOC C.D. Cal. Oct. 23 2008) (in case of alleged infringement of ornamental pineapple design used on sofa, differences in the shape of the base of the pineapple, the leaves of the pineapple, the width of the carving, and the shade of finish used did not establish lack of substantial similarity as a matter of law).  As a leading treatise explains:

> Despite the inherent limitations on creative expression in jewelry arising from heavy reliance on familiar symbols and designs as well as common functional elements, where it is shown that artistic choices exist and the similarities between two works result from making the same artistic choices to achieve a corresponding visual impact, a court is likely to find substantial similarity.

Osterberg & Osterberg, Substantial Similarity in Copyright Law § 10:4 (2013).

The effort Brighton expends arguing that its designs are not substantially similar to Sophia & Chloe's illustrates why a jury should resolve this inquiry. Doc. No. 46 at 12:4-17:22.  While Brighton proffers other jewelry designs that it claims render elements of Sophia & Chloe's works unprotectable, a careful look at those various other designers' collections underscores just how unique, and distinctly, each designer approached its use of the shapes involved.  Fitzgerald Dec. ¶ 15, Exh. L (expert report explaining conclusions that Sophia & Chloe's pieces "constitute original works, with a meaningful amount of creativity and unique expression"; that "prior to the time the Kiss Collections were created by Nathalie Sherman . . . no other designer had taken these elements and combined them in the unique, distinctive shapes and sizes of the Sophia & Chloe jewelry"; and that Brighton's "Toledo pieces are similar to the Kiss Collection pieces in nearly every significant respect"); *see also* Sherman Dec. ¶¶ 8, 17, Exh. I.  In contrast, Brighton's Toledo collection dramatically mimics Sophia & Chloe's distinctive Kiss designs and does so across the various pieces of the respective collections.  The glaring similarity of the Toledo and Kiss collections – coupled with Brighton's access to Sophia & Chloe's designs, the unlikely creation story of Ms. Cruser-Scott, and Brighton's suppression of evidence in this case – all point to Brighton's plagiarism.  A jury must decide whether Brighton infringed.

**C. Sophia & Chloe's Trade Dress Claim Must Also Go To a Jury.**

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations,

texture or graphics.'" *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).  In examining trade dress claims, the focus is thus on "the entire look of the product or packaging." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992).  As one leading commenter explains:

> A defendant cannot avoid liability for unfair competition simply by segregating out the various aspects of plaintiff's product, packaging and labels and claiming that no one of these is protectable in and of itself.  It is the total combination of elements of the "trade dress" as defined by the plaintiff that is at issue.

1 McCarthy, McCarthy on Trademarks § 8:2 (4th ed. 2013).  Brighton has infringed Sophia & Chloe's trade dress comprised of the following elements:

> **The bracket (or "kiss") shape, connected at a specific angular orientation; pieces of specific size and scale; dangling stones or crystals; embedded and secret symbolic elements; smaller Kiss designs surrounded by larger ones; and feminine accents.**

To prove trade dress, a plaintiff must demonstrate that: (1) the trade dress is nonfunctional; (2) the trade dress serves a source-identifying role because it has acquired secondary meaning; and (3) there is a substantial likelihood of confusion between the products at issue.  *Art Attacks Ink*, 581 F.3d at 1145.

Brighton does not challenge that Sophia & Chloe's trade dress is nonfunctional because it plainly is.  *See Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 810 (9th Cir. 2003); *see also*, *e.g.*, *Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F. Supp. 2d 1072, 1085 (C.D. Cal. 2006) (trade dress centered around jewelry design is non-functional because it "gives only a subjectively aesthetic, rather than utilitarian, advantage with consumers").  As to the remaining two elements, the essential factual questions are whether Sophia & Chloe's customers, and jewelry consumers as a whole, associate the Kiss collection with Sophia & Chloe, and whether Brighton's Toledo collection confuses consumers as to the

brands.  Neither question is appropriate for summary judgment.  Moreover, Sophia & Chloe has substantial evidence of secondary meaning and instances of actual confusion, including confusion of Brighton's own employees, making a jury verdict for Sophia & Chloe on its trade dress claim likely.

### 1.  Sophia & Chloe's Trade Dress Has Acquired Secondary Meaning.

Whether a particular trade dress has acquired secondary meaning is a question of fact.  *Am. Scientific Chem., Inc. v. Am. Hosp. Supply Corp.*, 690 F.2d 791, 792 (9th Cir. 1982).  A mark has developed secondary meaning when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000).  Evidence of secondary meaning can be direct or circumstantial, *Cont'l Lab Prods., Inc. v. Medax Int'l, Inc.*, 114 F.Supp. 2d 992, 999-1000 (S.D. Cal. 2000), and can derive from a variety of sources:

> Diverse types of evidence have been considered by courts in determining whether a mark has acquired a secondary meaning.  The evidence may include customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, number of sales, the amount, nature and geographical scope of advertising, the period of time during which the mark has been used, the number of customers, and actual confusion.

*Am. Scientific Chem*, 690 F.2d at 793.

A plaintiff can own trade dress in a single product design or over multiple product designs that create  an overall source-identifying visual impression.  *E.g.*, *Clicks Billiards*, 251 F.3d at 1257-58 (trade dress in design of multiple pool halls); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 920 F. Supp. 2d 1079 (N.D. Cal. 2013) (trade dress in design of cellphone); *Cosmos Jewelry*, 470 F. Supp. 2d 1072 (trade dress in design of jewelry modeled on plumeria flower).  This "consistent overall look" standard "does not require that the appearance of the series or line of products or packaging be identical," allowing a plaintiff to define and distinguish

between its various product lines "as it sees fit." *Apple*, 768 F. Supp. 2d at 1048.
A trade dress need not encompass every product the plaintiff sells; a plaintiff may
define which products display the trade dress in issue. *Id.*; *see also Abercrombie &
Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 633 (6th Cir. 2002).

There is *at least* sufficient evidence of secondary meaning to go to a jury.
Jane Groover-Maydahl, Sophia & Chloe's designated expert on the originality,
uniqueness, and creativity of its designs, was unable to locate any contemporary
jewelry (other than the jewelry at issue) with Moorish, Moroccan, or Islamic-
looking themes like those found in the Kiss collection.  Groover-Maydahl Depo.
at 15:19-16:2, 16:9-24, 24:16-25:7, 26:20-24, 33:7-25, 43:17-44:6.  And while
Brighton asserts that Sophia & Chloe's trade dress is not distinctive, it has yet to
identify any other jewelry on the market that bears a close resemblance to the
designs of the Kiss collection,[3] let alone a similarity as striking as that of its
Toledo collection.  Though Brighton's expert claims in her report that "many
designers and retailers offer arabesque jewelry collections . . . [and that many of
them] incorporate the bracket shape and . . . other elements that are used by
Sophia & Chloe," a glance at some of her examples (and their lack of resemblance
to the Kiss collection's trade dress) reveals how not credible her testimony is:

     

[3] The designer of at least one of the four other works to which Brighton points in
its motion voluntarily took its designs off of the market when Sophia & Chloe
notified it that its designs were infringing.  Sherman Dec. ¶ 18.  Each of the
others is distinct from Sophia & Chloe's works.  *E.g.*, Groover-Maydahl
Depo. at 24:16-25:7, 75:18-76:24, 82:15-83:4 (testimony of plaintiff's expert
distinguishing Sophia & Chloe designs from those of Vicente Agor).

Fitzgerald Dec. ¶ 16, Exh. M at ¶¶ 38-39, Exh. C at 127, 133, 136, Exh. D at 203.

As described *supra*, section II.B, Sophia & Chloe has invested in acquiring secondary meaning for its Kiss collection trade dress through its marketing efforts, including email blasts to its mailing list of thousands of customers, several social media campaigns, printed catalogs, postcards and mini-brochures, its own public website, advertisements run in national magazines and industry trade journals, and prominent exhibits at numerous industry tradeshows and in-store showcase events ("trunk shows"). Ansolabehere Dec. ¶¶ 3-7, 9-14, Exhs. A-M; Sherman Depo. II at 48:3-49:4, 52:3-21, 53:4-54:4, 54:11-16, 56:16-57:9, 57:23-58:18; Fitzgerald Dec. ¶ 8, Exh. E ("Ansolabehere Depo.") at 11:3-12:3, 12:15-24. Retailers and jewelry bloggers have also contributed to establishing the Kiss collection's trade dress by taking out advertisements of their own and promoting the collection online. Ansolabehere Dec. ¶ 15; Sherman Depo. II at 51:15-52:2. The extent to which Sophia & Chloe's Kiss collection acquired secondary meaning within the high-end jewelry market is evident from the sheer volume of editorial references to the collection in prominent national publications and number of celebrities spotted wearing Kiss collection jewelry during national media appearances. Sherman Dec. ¶¶ 13-14, Exhs. D-E.

Other evidence that the Kiss collection has acquired secondary meaning comes in the form of the confusion that Brighton's Toledo collection generated. As described above, multiple individuals familiar with Sophia & Chloe immediately recognized the Toledo collection as a knock-off of Sophia & Chloe's Kiss collection. *See supra* Part II.E (describing actions of retailers Pam Magazine, Irina Rachow, and Sarah Yavello); Sherman Dec. ¶ 9, Exh. C; Sherman Depo. II at 61:11-63:21; Kohl Depo. 115:23-116:21; Paloutzian Depo. at 98:25-99:21. Actual customers were confused as to the source of the similar Kiss and Toledo jewelry collections, believing Brighton knock-offs to be the same as Sophia & Chloe products. Sherman Depo. 104:5-18 (confusion of retailer's general

manager), 108:16-109:15 (confused customer at Montage Beverly Hills), 113:14-114:6 (confused customer in Bloomingdale's).  One of Brighton's executives is so unable to distinguish between the products at issue that, even after viewing and touching a physical Sophia & Chloe Kiss bangle during her deposition, she mistook it as a piece from Brighton's Toledo collection (which she was responsible for photographing for Brighton's promotional material).  Cable Depo. at 24:8-25:14; Exh. 92.  And when Sophia & Chloe employee Lauren Ansolabehere went into Brighton's UTC store in La Jolla wearing her Sophia & Chloe Kiss earrings, another of Brighton's employees commented on the fact that Ms. Ansolabehere's earrings had the same shape as did those in Brighton's Toledo collection.  Ansolabehere Depo. at 47:24-48:14.

This evidence of actual confusion, alone, implies there was secondary meaning in the senior user's trade dress, as "actual confusion is an indicium of secondary meaning." *Am. Scientific Chem.*, 690 F. 2d at 793.  Evidence of deliberate copying – such as that of Brighton's access to Sophia & Chloe's designs, the close similarity of the Toledo's knock-off collection, and Brighton's efforts to suppress evidence – "strongly supports" an inference of secondary meaning. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).

The opinion in *Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F. Supp. 2d 1072 (C.D. Cal. 2006), is instructive.  There, the plaintiff (Cosmos) designed and marketed a line of jewelry that represented plumeria flowers. *Id.* at 1075-76.  In explaining its finding that the Cosmos' plumeria jewelry line acquired secondary meaning, the trial court noted that it was "prominently featured [in] numerous stores throughout the Hawaiian Islands," was "heavily advertised in that region," and had "won awards sponsored by local trade organizations," before also describing that – as is the case with Sophia & Chloe's trade dress – jewelry store owners and customers came to associate the plumeria jewelry series with Cosmos

and its founder.  *Id.* at 1086.  The trial court also commented on the market

presence of other jewelry pieces representing the plumeria flower in its opinion:

> Finally, while there is no question that there are numerous jewelry manufacturers [that] are engaged in the design and promotion of pieces purporting to represent the plumeria flower, there is no evidence that there was other jewelry on the market which employed the precise combination of design elements as the Wong/Cosmos pieces during the relevant time period.

*Id.*  The Ninth Circuit affirmed all of the trial court's findings, including that

Cosmos' jewelry was (as Sophia & Chloe's is) identified with its source, and not

merely with plumeria flowers.  *Cosmos Jewelry, Ltd. v. Po Sun Hon Co.*, Case No.

06-56338, 2009 WL 766517, at *2 (9th Cir. Mar. 24, 2009).

      Sophia & Chloe's evidence of secondary meaning is at least as strong as was

that in *Cosmos* (in which the plaintiff not only survived summary judgment, but

also prevailed on its trade dress infringement claim at trial and on appeal): Sophia

& Chloe's jewelry reaches a larger market than Cosmos' did, the Kiss collection

has received far more national press coverage than Cosmos' plumeria collection

did, and even Brighton's own executive was confused by the similarity of its

Toledo collection and Kiss collection products.  As was the case in *Cosmos*, the

evidence of actual confusion generated by Brighton's knock-offs is strong, if not

dispositive, evidence.  There is *at least* sufficient evidence for this issue of fact to

go to a jury.  *Am. Scientific Chem*, 690 F.2d at 793-94 (reversing as "clearly

erroneous" a trial court ruling that minimized evidence of actual confusion in

concluding plaintiff's name had not acquired secondary meaning).

### 2.  Brighton's Knock-Offs Are Not Only Likely to Cause Customer Confusion, They Already Have.

      As with the acquisition of secondary meaning, likelihood of confusion is

predominately a question of fact.  *Levi Strauss*, 778 F.2d at 1355.  A likelihood of

confusion exists when consumers are likely to expect that a product is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.  *See*, *e.g.*, *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.").

"As is the case of trademark infringement, evidence of actual buyer confusion is not necessary in order to find a *likelihood* of confusion."  1 McCarthy, McCarthy on Trademarks § 8:15 (4th ed. 2013).   The fact that multiple customers have actually been confused about the source of Brighton's knock-off products, mistaking them for Sophia & Chloe's Kiss collection jewelry, nonetheless satisfies this element.  Sherman Depo. 104:5-18 (recalling conversation with retailer's general manager who expressed that she was going to stop purchasing Kiss collection bangles because she could obtain them – from Brighton – for a lot less money), 108:16-109:15 (confused customer at Montage Beverly Hills whose sister was purchasing Kiss collection earrings and stated she had purchased the matching necklace at Brighton), 113:14-114:6 (confused customer in Bloomingdale's who mistook the Brighton knock-off bangles she was wearing with the Kiss bangles of Lauren Weinberg, Sophia & Chloe's part-time administrative assistant, standing next to her).  While Brighton may display its products with Brighton's name and branding, this does not overcome the infringing similarity in trade dress.  *E.g.*, *Samara Bros., Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 128 (2d Cir. 1998) ("labels alone cannot insulate an infringer"), *rev'd on other grounds*, 529 U.S. 205 (2000).

**D.  Sophia & Chloe Can Still Recover Brighton's Profits as Damages.**

As to the damages issue Brighton raises, Sophia & Chloe does not seek actual damages based on its lost sales and diminution in value.  It can nonetheless recover of Brighton's profits on sales of the infringing articles.  The Court should

therefore deny the motion insofar as it may seek to preclude Sophia & Chloe from recovering Brighton's profits as a measure of "actual damages."

**E.  Each of Sophia & Chloe's Copyrights Lives Its Own Copyright Life.**

In an effort to mitigate its exposure to statutory damages. Brighton argues that only three of Sophia & Chloe's 13 registered copyrights have the ability to "live their own copyright life."  Doc. No. 46 at 25:5-22; *see also Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990).  Brighton is mistaken.  Unlikely the example in *Walt Disney*, in which the plaintiff's six copyright registrations for depictions of Mickey and Minnie Mouse were found to justify only two statutory damage awards – one for Mickey and one for Minnie – each of Sophia & Chloe's thirteen registration corresponds to a different work.  Sherman Dec. ¶ 7, Exh. B. The Ninth Circuit's opinion in *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186 (9th Cir. 2001) – in which the Ninth Circuit found that each of the 440 separate episodes of four television series was capable of living its own copyright life – is instructive.  Like the different episodes of a common television series (which feature the same characters, the same sets, the same themes, and the same plotlines as other episodes in the series), each of the different pieces of jewelry to which Sophia & Chloe holds a copyright registration (which feature many of the same design elements and features) "has an independent economic value and is, in itself, viable."  *Id.* at 1193.

## IV.   Conclusion

For these reasons, the Court should deny Brighton's motion.

Dated:   April 21, 2014            CHAPIN FITZGERALD LLP

By: /s/ Kenneth M. Fitzgerald
_____
Kenneth M. Fitzgerald, Esq.
Douglas J. Brown, Esq.
Attorneys for Plaintiff
Sophia & Chloe, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28