1

2

3

4

5

6

7

8

9 UNITED STATES DISTRICT COURT

10 SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| SOPHIA & CHLOE, INC., a California Corporation, | Case No. 12cv2472 AJB (KSC) |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| BRIGHTON COLLECTIBLES, LLC, | |
| Defendant. | |
| | (Doc. No. 76) |

The instant matter comes before the Court on Defendant Brighton Collectibles, LLC's motion for summary judgment, or, in the alternative, summary adjudication as to certain damages claims. With the issuance of this Order, the Court also vacates the scheduled pretrial conference due to a conflict in the Court's calendar. The parties are directed to jointly contact chambers, no later than April 3, 2015, to confirm their availability for the following:

1.     A Final Pretrial Conference on May 28, 2015 at 1:30 PM;

2.     A Motion in Limine hearing on June 26, 2015 at 2:00 PM; and

3.     Jury Trial starting Tuesday, July 7, 2015.

When Counsel contact chambers in this regard, they must also provide the estimate for the length of trial in this case. Once dates are confirmed a full scheduling order will issue with interim dates set as necessary.

## I. BACKGROUND

The instant case involves claims of copyright infringement, trade dress infringement, and unfair competition. (Compl. 1, Doc. No. 1.) Plaintiff Sophia & Chloe, Inc. is a California corporation based in San Diego that designs, distributes, and sells jewelry and accessories for women. (*Id.* ¶¶ 1, 6.) Plaintiff was founded and is operated by Nathalie Sherman, a Moroccan-born designer, who started designing jewelry in 1996. (*Id.* ¶ 6.) Plaintiff's jewelry is sold in approximately seventeen boutiques in California and in at least one boutique in fourteen additional states. (Wesley Decl. Ex. 18, Doc. No. 46-2.) In addition to brick and mortar stores, the jewelry is also available through Plaintiff's own website. (Ansolabehere Decl. ¶ 9, Doc. No. 79-7.) Plaintiff's products are marketed through social media and social commerce websites such as Facebook, Twitter, Pinterest, and Polyvore, as well as e-commerce websites such as Amazon, Opensky, Myhabit, MaxandChloe, CoutureCandy, and others. (*Id.* ¶¶ 10-13.)

Defendant Brighton is also in the fashion business, designing and manufacturing women's accessories, including jewelry. (Kohl Decl. ¶ 2, Doc. No. 46-11.) Brighton was founded in the 1970s and sells its products nationwide in approximately 5,000 specialty stores as well as approximately 160 Brighton-owned retail stores. (*Id.* ¶¶ 2-3.)

The jewelry at issue features a "bracket" shape design as its core component - { } - that henna tattoo artists refer to as a "kiss." (Sherman Decl. ¶¶ 3, 21, Doc. No. 79-4; *id.* Ex. L ("Sherman Depo. I") at 35:21-42:25.) Hence the name of Plaintiff's 2007 "Kiss" and 2010 "Buddha's Kiss" collections (collectively, the "Kiss collection"[1]). (Sherman Decl. ¶¶ 3-5.)

---

[1] The Court acknowledges Defendant's argument that Plaintiff does not own a copyright for the Kiss collection as a whole, and instead only some of the individual pieces within that collection are copyrighted. (Def.'s Reply 11, Doc. No. 82.) Even so, for the sake of brevity, the Court will refer to the designs at issue as the Kiss collection, recognizing not each item in that collection is involved in this litigation as it pertains to copyright.

In 2010, Sherman applied for and received thirteen copyrights on the designs at issue. (Sherman Decl. Ex. B.) Plaintiff is the exclusive owner of the thirteen designs at issue, having received assignment from Sherman, which have been registered with the Copyright Office as original works. (Compl. ¶ 15, Ex. A.)

Defendant's allegedly infringing jewelry is part of Defendant's "Toledo" collection and was designed by one of its designers, Kim Cruser-Scott, who has been employed by Defendant since 1999. (Wesley Decl. Ex. 203 ("Cruser-Scott Depo.") 10:10-11.) Cruser-Scott first sketched the Toledo collection in November 2011, and received inspiration for the collection three or four months prior to that time. (*Id.* at 55:9-20.) The collection was approved by Defendant's president, Jerry Kohl, and Defendant began selling the Toledo collection in August 2012. (Wesley Decl. Ex. 204 ("Kohl Depo. I") 19:1-3, Doc. No. 46-4; Compl. ¶ 23.)

Following a cease-and-desist letter, Plaintiff filed the present action in October 2012. (Fitzgerald Decl. Ex. D ("Kohl Depo. II") 147:10-16, Doc. No. 79-2; *see generally* Compl.) Plaintiff alleges copyright infringement, trade dress infringement, unfair competition under California common law, and unfair competition under California statute. (Compl. ¶¶ 18-58.)

Defendant's motion for summary judgment was originally filed in March 2014, after which the Court set a briefing schedule, and scheduled a hearing. (Mot., Doc. No. 46; Order, Doc. No. 57.) An issue regarding a discovery dispute between the parties was then raised, leading this Court to determine summary judgment was premature. (Order 1, Doc. No. 63.) The Court denied the pending summary judgment motion without prejudice and determined Defendant could refile its motion after the completion of discovery. (*Id.* at 2.)

The motion has since been refiled, fully briefed, and presented through a hearing held by the Court on February 27, 2015. Defendant argues summary judgment is warranted because Plaintiff's copyright, trade dress, and unfair competition claims fail as a matter of law. (Def.'s Mem. 1, Doc. No. 54.) In the event the Court denies summary judgment, Defendant requests the Court summarily adjudicate certain damages claims. (*Id.* at 1-2.) Unsurprisingly, Plaintiff opposes the motion. (Pl.'s Mem., Doc. No. 79.)

## II.    LEGAL STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering the motion, the court must examine all the evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in his favor." *Id.* at 255, 267.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

Defendant moves for summary judgment on Plaintiff's copyright, trade dress, and unfair competition claims, and in the event of any denial, moves the Court to summarily adjudicate certain damages issues. The Court addresses the arguments in the order in which they were lodged.

### A.    Copyright Infringement

Defendant's first contention rests on Plaintiff's first cause of action: copyright infringement. To establish copyright infringement, a plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

//

### 1. Access

Defendant does not challenge Plaintiff's ownership of a valid copyright (Def.'s Mem. 9), and thus the Court looks to the second element, copying. "Because direct evidence of copying is not available in most cases," a plaintiff can establish copying by showing (1) that the defendant had access to the plaintiff's work and (2) that the two works are substantially similar. *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

The Court starts by reviewing access. "Proof of access requires 'an opportunity to view or to copy plaintiff's work.'" *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977)). "To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of either (1) a "chain of events" linking the plaintiff's work and the defendant's access, or (2) "widespread dissemination" of the plaintiff's work. *Three Boys Music*, 212 F.3d at 482.

Defendant contends that Plaintiff has not established access. (Def.'s Mem. 9-12.) This argument, however, is unpersuasive. Defendant highlights that Cruser-Scott does not live in Southern California and that she sketched Toledo in November 2011 in Idaho. (Def.'s Mem. 6; Cruser-Scott Depo. at 55:1-20.) Importantly, however, Cruser-Scott had only moved from Southern California in 2011. (Cruser-Scott Depo. 18:18-25.) Despite moving out of state, she is still connected to Defendant. She returns to Defendant's Southern California office at least three to four days monthly. (*Id*. at 19:15-25.) She is in contact with Kohl once or twice a month (*Id*. at 21:1-4), and talks with her supervisor, Monica Kostelnik daily or several times a week. (Kohl Depo. II 13:23-25-14:1.)

Cruser-Scott testified that she had never heard of Plaintiff prior to this lawsuit and did not discuss the Toledo jewelry with anyone as she was designing it. (Cruser-Scott Depo. 61:6-11.) The evidence on record supports that others at Defendant were aware of Plaintiff,

however. It is undisputed that Kohl registered for Plaintiff's marketing email list beginning in 2009. (Ansolabehere Decl. ¶ 7.) Kohl testified it was "possible" he had seen Plaintiff's jewelry before Toledo's release, and "quite possible" he had seen photographs of Plaintiff's jewelry before Toledo's release, although he did not remember exactly. (Kohl Depo. I 6:24-25, 7:1-9.) Kohl, however, acknowledges that he receives Plaintiff's emails on a daily basis or regular basis, that he looks at them, that they always have photographs, and that he "assumes" he has regularly been looking at Plaintiff's products since receiving the emails. (Kohl Depo. II 51:1-24.) Kohl testified that he did not email or call attention to Plaintiff's designs to anyone at Defendant. (Kohl Depo. I 7:15-22.) Submitted in opposition, however, is an email between Kohl and another employee of Defendant's in which Kohl asked what brands are sold in a particular store, with the employee responding with the names of eleven brands, one of which was Plaintiff. (Fitzgerald Decl. Ex. O.) Plaintiff also submitted a March 2012 email from Kohl to Kostelnik, Cruser-Scott's supervisor. (*Id.* Ex. I.) Kohl forwarded a marketing email from Plaintiff to Kostelnik and included the message "Could we please talk about earrings." (*Id.*) A few weeks earlier, this time without a personal message, Kohl forwarded an earlier version of that marketing email to Lynn Rosenthal, an independent contractor in charge of Defendant's social media. (*Id.*; Kohl Dep. II 65:12-17.) Two months later, he forwarded another of Plaintiff's marketing emails to Rosenthal. (Fitzgerald Decl. Ex. I.)

Plaintiff also submitted an email in which Kostelnik wrote: "I'd like you to see Maryam's colorful [s]tatement earrings she designed . . . you had given her some of these ideas." (*Id.*) Kohl also testified that if asked about drawings of potential products, he offers his opinion. (Kohl Depo. I 18:14-19.) Although he did not recall giving opinions about the Toledo designs at issue, he approved the products to be released by Defendant. (*Id.* at 19:1-3.) Finally, he acknowledged that he often gives designers ideas verbally. (Kohl Depo. II 67:1-8.) Kohl frequently visits stores that sell jewelry and visited a number of boutiques during the relevant time period where Plaintiff's jewelry is sold. (*Id.* at 29-36.)

In addition, Plaintiff submitted extensive information about its marketing practices. A declaration by Lauren Ansolabehere, Plaintiff's operations manager, carefully details, with attachments, Plaintiff's various marketing efforts. (Ansolabehere Decl. & Exs.) The submission asserts that since 2007, Plaintiff had distributed at least 24,000 postcards featuring at least one of the designs from the Kiss collection; and Ansolabehere provides additional information regarding Plaintiff's postcards, brochures, catalogs, print advertisements, email blasts, wholesale email list, retail email list, website traffic reports, and information about the e-commerce, social media, and social commerce sites on which Plaintiff's items are sold, and blogs that have featured the Kiss collection. (*Id.*)

In light of all of the above, the Court is unconvinced by Defendant's claims regarding lack of access. Defendant also highlights certain cases in which widespread dissemination was lacking. *Art Attacks Ink, LLC*, 581 F.3d at 1143 (holding plaintiff had not widely disseminated its T-shirt designs, even though the designs were displayed at fair booths and kiosks, on persons wearing the T-shirts, and on the internet, and noting, among other things, that the plaintiff sold only 2,000 T-shirts bearing the designs annually); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (holding that a video that sold 17,000 copies over a thirteen-year period could not be considered widely disseminated). First, the Court notes that both chain of events and widespread dissemination are at issue here, while the cited cases focus only on widespread dissemination. Second, the Court is satisfied that the present matter reaches beyond a "bare possibility" that Defendant had access to Plaintiff's works. This is so despite some of the emails regarding Plaintiff being sent after Cruser-Scott created the Toldeo designs. (*See* Def.'s Reply 11.) The later emails still assist the Court in evaluating access in terms of how those involved with Defendant interact. Even if this Court were to ignore the later emails, a reasonable jury could still find that there was a "reasonable possibility" that Defendant had an opportunity to access

1  Plaintiff's work. The Court holds that Plaintiff raised a genuine dispute of material fact on

2  access.[2]

### 2.    Substantial Similarity

4        In addition to arguing lack of access, Defendant also argues the designs "are not

5  substantially similar in the *protectable expression* to [Plaintiff's] designs." (Def.'s Mem.

6  12.) Defendant highlights that the unprotected elements must be "filtered out," so that only

7  the artist's protectable idea remains. (*Id.*) Defendant then proceeds to discuss the Toledo

8  items at issue here.

9        First, after reading through Defendant's analysis of the subject pieces of jewelry,

10  Defendant asserts that four perpendicular shapes, brackets or Ogee arches are not protected

11  under copyright as they are common motifs found in art and architecture across a myriad of

12  cultural traditions. (Def.'s Mem. 13-14; *see* Mulder Decl. ¶¶ 19, 33-34, Doc. No. 46-5

13  (discussing the Ogee shape and bracket).) Specifically, Defendant argues that, although a

14  combination of unprotectable elements may create an original, copyrightable expression, not

15  every combination of unprotectable elements does. (Def.'s Reply at 6); *Satava v. Lowry*, 323

16  F.3d 805, 811 (9th Cir. 2003). The Court is aware that copyright protection does not extend

17  to "standard, stock, or common" elements, and those generic elements must be excluded

18  from the comparison. *Satava*, 323 F.3d at 810-11. This rule prevents one artist from

19  claiming too large of a monopoly on unoriginal, common elements that the public should

20  be allowed to use in fair competition. *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446

21  F.2d 738, 741-42 (9th Cir. 1971). By way of example, courts have explained that a designer

22  cannot claim for itself the right to all brightly colored jelly fish designs because many jelly

23  fish are brightly colored. *Satava*, 323 F.3d at 810-11. That designer could, however,

24  copyright his work to the extent he adds a distinctive curl to particular tendrils or arranges

---

26      [2] Plaintiff also alleges access pursuant to the corporate receipt doctrine and
striking similarity. *See Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal.
27  2010); *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987); (Pl.'s Mem. 12). Having
found that access is easily established as being inappropriate for summary judgment, the
28  Court will not address these arguments.

certain hues in his original design. *Id*. Similarly, the Copyright Act will protect a designer who creatively selects and arranges a sufficient number of unprotectable elements into a new and original combination. *Id*. The Ninth Circuit has applied that exception to a floral fabric design and concluded that the plaintiff's original selection, arrangement, and composition of leaves, stems, flowers, and buds was copyrightable. *LA Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848-51 (9th Cir. 2012) (determining summary judgment inappropriate because jury must compare similarity of two designs); *see also Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, No. 10-CV-419-GPC WVG, 2012 WL 6553403, at *8 (S.D. Cal. Dec. 13, 2012) (denying summary judgment "even though hearts, flowers, ropes, and scrolls are familiar shapes"). Although the Court acknowledges Defendant's interpretation of what is and what is not protected, the interpretation is overly broad. (Def.'s Mem. 13-17.)

Next, the parties dispute how substantial similarity should be evaluated in this situation. Defendant raises the Ninth Circuit's extrinsic/intrinsic test. The "extrinsic test" considers the protectable elements in the copyrighted work, *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994), and is an "'objective comparison of specific expressive elements'; [focusing] on the 'articulable similarities' between the two works." *LA Printex Indus., Inc.*, 676 F.3d at 848 (quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)). The "intrinsic test" is a subjective comparison that focuses on "'whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works.'" *Id*. (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). Defendant acknowledges that Courts apply only the extrinsic test at the summary judgment stage. (Def.'s Mem. 12); *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010) ("On a motion for summary judgment, we apply only the extrinsic test."). Plaintiff argues that the extrinsic test is inappropriate in jewelry cases, however, and instead offers the more lenient *Cavalier* test as the proper examination:

12cv2472

> [A] court looks to the similarity of the objective details in appearance . . . . Although we do not attempt here to provide an exhaustive list of relevant factors for evaluating art work, the subject matter, shapes, colors, materials, and arrangement of the representations may be considered in determining objective similarity in appearance.

297 F.3d at 826. The Court finds the result to be the same under either analysis.

Using the more-stringent extrinsic test, this Court now moves to its analysis of substantial similarity. First, Plaintiff indicated at the hearing that it is no longer pursuing its copyright as to the Toledo cuff bracelet (sometimes referred to as the bangle). With a claim no longer being pursued as to the cuff, the Court will not include that item in its discussion. After reviewing the other items, however, the Court is unconvinced that summary judgment is appropriate. *L.A. Printex*, 676 F.3d at 848 ("Summary judgment is not 'highly favored' on questions of substantial similarity in copyright cases."); *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990) (noting that summary judgment is appropriate "if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party that no reasonable juror could find substantial similarity of ideas and expression." (quotation omitted)). Instead, this is exactly the type of situation where a jury needs to decide the genuine issues of disputed fact. In making this determination the Court has carefully reviewed the remaining five items and compared them with the corresponding Kiss designs.

The Court finds that a reasonable jury could find that Defendant's and Plaintiff's works are substantially similar. Defendant provides a descriptive comparison of each of the five pieces of jewelry in this case to argue that there exists no substantial similarity.[3] (Def.'s Mem. 13-17.) Applying the objective factors of the extrinsic test, this Court disagrees with

---

[3] Defendant argues Plaintiff failed to sustain its burden in relation to its argument for substantial similarity because Plaintiff did not provide more particular evidence regarding the design elements of the alleged infringement. (*See* Def.'s Reply 8.) The Court disagrees. Plaintiff's thoroughly briefed argument, oral argument, exhaustive contribution of photos, exhibits, and the production of the actual jewelry at the hearing, assisted this Court in its determination of substantial similarity, despite Plaintiff not addressing the question in the manner in which Defendant outlines.

the Defendant's assertion of no substantial similarity. This Court finds that Defendant's use of an especially similar bracket and arch to create the shapes present in its Toledo narrow bangle, necklace and earrings satisfies the extrinsic test and thus substantial similarity can be found. More specifically, the use of the same bracket to create a four-sided shape that is enclosed by the same larger shape in Defendant's Toledo necklace closely mimics Plaintiff's Kiss collection pieces at issue and, for the same reasons, the use of congruent brackets to create a teardrop shape in the Defendant's Toledo statement earrings also help make a determination for Plaintiff's argument in regards to substantial similarity. The presence of so many similarities and common patterns in Defendant's Toledo designs as compared to Plaintiff's Kiss collection gives rise to a triable question of substantial similarity not proper for summary judgment. To Defendant's remaining claim regarding unprotected elements, the Court reminds Defendant that the arrangement of unprotected elements may warrant protected status in some instances. *Satava*, 323 F.3d at 811 ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection." (quoting *Feist*, 499 U.S. at 361)).

The Court acknowledges that not all copying is unlawful and that not all copying amounts to a successful copyright case. (*See* Def.'s Reply 2, 4-5.) However, after reviewing both Plaintiff's and Defendant's extensive briefing papers, which contain exhaustive exhibits of the items at issue, as well as analyzing the actual jewelry pieces at the hearing, the Court finds summary judgment regarding copyright infringement is not warranted. In light of the above, the Court denies Defendant's challenge.

## B.  Trade Dress

In addition to challenging Plaintiff's copyright claim, Defendant also challenges Plaintiff's claim of trade dress infringement. "[T]rade dress involves the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989) (quotation omitted). To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade

dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products. *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1005 (9th Cir. 1998). Defendant does not challenge that the jewelry is nonfunctional, but instead contends the trade dress does not have a "consistent, distinctive overall look and feel"; has not acquired secondary meaning; and that confusion as to the source of the products is not likely. (Def.'s Mem. 18-23.) In terms of scope, Plaintiff advised the Court at the hearing on this matter that the trade dress claim encompasses the entire Kiss collection, rather than merely the thirteen copyrighted items at issue here.

### 1. Distinctive Look

Defendant argues the Court must first consider whether the claimed trade dress has a "consistent, distinctive overall look and feel." (Def.'s Mem. 18.) Defendant argues "[Plaintiff's] claimed trade dress is a hodgepodge of 64 disparate designs—from a gold [teardrop] shaped earring with a hanging jewel to a simple silver Bracket Frame earring to a traditional Moroccan bangle . . . the only commonality is a Moroccan design aesthetic and the use of the bracket shape." (*Id.* at 18-19 (citing Wesley Decl. Ex. 59).) The Court agrees that the trade dress claim is ill-defined. However, Defendant conflates consistent look and distinctiveness. (Def.'s Mem. 18 (first discussing consistency of the product line, then discussing a "consistent, distinctive" feel).) As support for Defendant's proposition that courts must determine whether the line has a consistent look, Defendant cites a Third Circuit case. *See Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172 (3d Cir. 2000) ("We are persuaded that the 'consistent overall look' standard, set forth in *Walt Disney* and applied by the Second Circuit Court of Appeals in *Landscape Forms* and other cases, is the appropriate threshold inquiry in a trade dress case where the plaintiff seeks protection for a series or line of products or packaging."). Defendant cites nothing to demonstrate the Ninth Circuit has adopted such a test. *See Apple Inc. v. Samsung Elecs. Co.*, 768 F. Supp. 2d 1040, 1048 (N.D. Cal. 2011) ("Although the Ninth Circuit does not appear to have

12

addressed the issue, some circuits have held that where a plaintiff seeks trade dress protection in a line of products, the plaintiff must establish that the line of products has a consistent overall look.").[4]

The Court acknowledges the arguments regarding distinctive look. As the Supreme Court has noted, "Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods,' as the section requires." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000). The Supreme Court went on to discuss § 2, and by analogy § 43(a), noting that a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning." *Id.* at 211; *see* 15 U.S.C. § 1125(a).

Here, both parties agree that secondary meaning will need to be established. (*See* Pl.'s Mem. 18-23; Def.'s Mem. 18-23.) As it is undisputed that the trade dress is nonfunctional, the Court continues to secondary meaning and confusion. *See Wal-Mart*, 529 U.S. at 216 ("In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore Protectable, only upon a showing of secondary meaning.").

## 2. Secondary Meaning

Defendant challenges whether the trade dress has acquired a secondary meaning. (Def.'s Mem. 20.) To succeed on a trade dress infringement claim based on product design, the plaintiff must show that her design has attained secondary meaning. *Wal-Mart Stores*, 529 U.S. at 214. "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers;

---

[4] Notably, "[t]he consistent overall look standard do[es] not require that the appearance of the series or line of products or packaging be identical, and a plaintiff generally is permitted to define a product line as it sees fit." *Apple*, 768 F. Supp. 2d at 1048.

established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). To show secondary meaning, a plaintiff must demonstrate "a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source." *Japan Telecom v. Japan Telecom Am.*, 287 F.3d 866, 873 (9th Cir. 2002) (internal quotation omitted). "Secondary meaning is 'the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product.'" *Guichard v. Universal City Studios, LLLP*, No. C 06-6392 JSW, 2007 WL 1750216, at *2 (N.D. Cal. June 15, 2007) (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985)), *aff'd*, 261 F. App'x 15 (9th Cir. 2007).

Plaintiff sets forth various ways to prove secondary meaning. Plaintiff includes an expert report prepared by Jane Groover-Maydahl, whose experience in jewelry design spans forty years.[5] (Groover-Maydahl Decl., Doc. No. 79-12.) Groover-Maydahl's attached report provides that she knows of no other designer who has combined the elements in the manner that Plaintiff has, which could support exclusivity. (*Id.* Ex. B at 6.) Groover-Maydahl also testified that her searches did not reveal any contemporary Moorish jewelry other than the designs at issue in this litigation. (Fitzgerald Decl. Ex. G ("Groover-Maydahl Depo.") at 26:20-24, 33:7-24.)

Plaintiff also attached several declarations of persons experienced in the jewelry business. One was by Regina Cacciato, owner of a New York boutique, who stated she associates Kiss with Plaintiff and believes her customers do too. (Cacciato Decl. ¶¶ 2, 4, Doc. No. 79-13.) She also noted that she believed that Defendant's pieces were in fact part of Plaintiff's collection. (*Id.* ¶ 5.) A number of the other declarations echo Cacciato's thoughts. (*See* Duffy Decl., Doc. No. 79-14 (Southern California wedding planner associates

---

[5] The Court acknowledges Defendant's contention that the Groover-Maydahl declaration should be inadmissible in relation to substantial similarity. However, the Court here is applying the Groover-Maydahl declaration to its analysis in trade dress. Thus, Defendant's argument in that regard is not applicable to the analysis at hand.

Kiss collection with Plaintiff, considers it to be distinct and original, and stated people will comment on the brand by name when she wears items by Plaintiff); Haedt Decl., Doc. No. 79-15 (now-retired declarant owned boutique for several decades and notes that he associates Kiss with Plaintiff, recognized Defendant's products as copies of Plaintiff's, and discusses customers' fondness for the Kiss collection); Lawton Decl., Doc. No. 79-16 (accessories buyer for boutique notes that customers would recognize the jewelry and identify Plaintiff by name, and would ask to purchase Kiss collection pieces, referring to Plaintiff by name); Middleton Decl., Doc. No. 79-17 (longtime fashion accessories sales representative notes that buyers at retail accounts comment on Plaintiff's brand by name when declarant wears pieces from Kiss collection, have asked declarant to stock it, and declarant recognizes Kiss collection and associates it with Plaintiff).) One of the declarations was provided by a customer, who described the Kiss collection as Plaintiff's "signature look," recalls receiving comments naming Plaintiff when wearing Plaintiff's jewelry, and noted recognizing Brighton's pieces as "knock offs." (Strange Decl., Doc. No. 79-18.) She also attached a copy of a social media post she had written to Plaintiff in which she reported a passerby recognized her earrings as Plaintiff's. (*Id.* Ex. A.)

Defendant asserts all of the declarations should be struck because the witnesses were not disclosed. (Def.'s Reply. 17). Federal Rule of Civil Procedure 37(c) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." At the hearing on the matter, the Court questioned Plaintiff regarding the circumstances under which the declarations were obtained and submitted. Plaintiff averred that the witnesses were, in fact, disclosed, and that Plaintiff served an amended disclosure in November 2014. As such, Plaintiff argued the witnesses were seasonably disclosed once information relevant to the claims came to light.

While the circumstances may not have been ideal, Plaintiff did not fail to disclose but instead offered a late disclosure. The Court is persuaded that the late disclosure was substantially justified. Moreover, the late disclosure was harmless because Plaintiff's reason for submitting the declarations—to support the trade dress allegations—fails. In any event, the Court notes that the declarations are anecdotal and from a limited, primarily insider pool, weakening their effectiveness. Even with the declarations and the other evidence cited by Plaintiff, secondary meaning is not established. Most of the declarations are from those in the jewelry industry, which does not represent the consuming public. *See Sharper Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1073 (N.D. Cal. 2006) ("Likewise, the sworn statements of Sharper Image retailers are not probative of association in the minds of the consuming public."); *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 43 n.14 (1st Cir. 2001) (noting that opinions of retailers and those active in the field are not evidence of views of the consuming public).

Notably, Plaintiff does not offer a consumer survey. Although Defendant argues this is sufficient to sink Plaintiff's secondary meaning claim, there are other factors to consider too. Plaintiff used the trade dress before the Defendant. While this is not in itself sufficient to deny summary judgment, it at least supports Plaintiff's position. Also notable is the amount of advertising that Plaintiff did. Plaintiff meticulously details its advertising and publicity efforts, providing the Court with extensive information about the product. (*See* Anoslabehere Decl. & Exs; Sherman Decl. & Exs.) Again, however, this does not justify all that is not presented to the Court necessary to resist such a motion. *Sharper Image*, 425 F. Supp. 2d at 1073 (discussing distinctiveness and secondary meaning and concluding that evidence of media coverage and a heavy advertising campaign is not sufficient to allow a reasonable inference of consumer association between the alleged trade dress and the source). In conclusion, although the Court acknowledges that summary judgment warrants viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact regarding secondary meaning.

### 3. Confusion as to Source

Finally, the Court examines Defendant's final challenge to the trade dress claim: confusion as to the source. (Def.'s Mem. 23.) Eight factors, often referred to as the *Sleekcraft* factors, are used to evaluate the likelihood of confusion. *AMF, Inc. v. Sleekcraft*, 599 F.2d 341, 348-49 (9th Cir. 1979). Those factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (citing *Sleekcraft*, 599 F.2d at 348-49)). However, summary judgment on likelihood of confusion is appropriate when marks are so dissimilar that there can be no likelihood of confusion. *See Chesebrough-Pond's, Inc., v. Faberge, Inc.*, 666 F.2d 393, 397-98 (9th Cir.1982) (affirming summary judgment of non-infringement where marks were clearly dissimilar and conclusory expert affidavit was unlikely to assist trier of fact).

Plaintiff does not address the *Sleekcraft* factors by name and provides a slim analysis of confusion. As support for the confusion discussion, Plaintiff offers the deposition of Sherman in which she recalled a conversation with a retail general manager who told Sherman that she could get a Toledo bangle for "a lot less money" than the Kiss bangle and that the two pieces were the same thing. (Sherman Declaration Ex. J ("Sherman Depo. II") 104:5-18, Doc. No. 56-11.) Sherman also discussed a designer showcase event where a customer's sister mentioned buying a necklace from Brighton that "matched" the Kiss earrings. (*Id.* at 108:16-25-109:1-7.) Finally, Sherman testified that an employee of hers was at a department store wearing Kiss bangles when a fellow customer, wearing the Brighton version, complimented the employee's taste, implying they were wearing the same jewelry. (*Id.* at 113:14-25-114:1-6.) Review of Kohl's deposition also reveals that a person in the business had called him and told him Toledo looks similar to Plaintiff's pieces. (Kohl Depo. II 115:23-25-116:1-21.)

Most of these cited sources of information are from Plaintiff's founder, weakening the probative value. Additionally, although Plaintiff submitted evidence and discussed the facts in the brief's factual section, Plaintiff only briefly analyzes confusion in its memorandum. From viewing the facts presented, this Court can infer that there is some close proximity of the products—both are in Southern California. Defendant and Plaintiff both market nationally, although Defendant undisputably has a much larger audience, selling at 5,000 specialty stores and 160 Defendant-owned retail stores. Plaintiff provides extensive information regarding the marketing channels used, including detailing the postcards, brochures, editorials, newspaper articles, magazine articles, blog posts, television appearances, celebrity use, and other ways that the item has been actually marketed or has gained notoriety. (Ansolabehere Decl. & Exs.) Plaintiff and Defendant both provided great detail about how they developed their respective lines and the inspiration for the lines' development. (Sherman Decl. ¶¶ 3-4; Wesley Decl. at 51:10-25-58:1-25.) Even in light of this, although there is some evidence as to confusion, confusion has not been established so as to resist the motion.

In light of the above and acknowledging the summary judgment standard, the Court concludes the claimed trade dress is nonfunctional, but that a reasonable jury could not find that the claimed trade dress acquired secondary meaning or that there is a substantial likelihood of confusion. As such, the Court grants summary judgment as to the trade dress claim.

Finally, although the unfair competition claims are only discussed in passing in the briefing, Defendant asserts the claims fail as a matter of law because the unfair competition claims mirror the trade dress allegations. (Def.'s Mem. 1; Def.'s Reply 15.) The Court's review of the Complaint confirms this mirroring. When questioned at the hearing, Plaintiff agreed. As such, in light of its grant of summary judgment as to trade dress, the Court also grants summary judgment on the unfair competition claims.

//

12cv2472

### C. Damages

In the event of denial of any part of its motion, Defendant requests summary adjudication as to certain remedies. Specifically, Defendant challenges Plaintiff's request for actual damages and asserts that Plaintiff would be entitled to a maximum of three damages awards. Both arguments are made in a cursory manner over the last page of Defendant's memorandum.

#### 1. Actual Damages

Regarding actual damages, Defendant argues that although Plaintiff pled a request for actual damages, Plaintiff no longer intends to seek that form of remedy. (Def.'s Mem. 24.) Defendant also highlights that Plaintiff has not identified any evidence of actual damages or a reasonable method for calculation. (*Id.* at 25.) Plaintiff responds that it does not seek damages based on lost sales, but may seek damages on Defendant's profits on sales of infringing articles. (Pl.'s Mem. 24-25.)

The Court discussed this issue with the parties at the hearing. Plaintiff noted that it would not be pursuing its own lost sales, but may pursue disgorgement or statutory damages. Thus, Defendant's request is granted to the extent Plaintiff's lost sales are at issue. The Court will not, however, prematurely limit Plaintiff at this point regarding the type of damages it may elect. Thus, to the extent Defendant seeks further narrowing, the request is denied.

#### 2. Award for Works, Not Infringements

Defendant also moves the Court to conclude that, although Plaintiff owns thirteen copyrights, it is not entitled to more than three statutory damages awards. *See* 17 U.S.C. § 504(c) (providing that a copyright owner is entitled to no less than $750 and no more than $30,000 per each "work" that was unfringed on, with more recoverable for wilful infringement); (Def.'s Mem. 25). Plaintiff disagrees, arguing each of Plaintiff's copyrights has the ability to "live [its] own copyright life." (Pl.'s Mem. 25.)

Both parties discuss *Walt Disney Co. v. Powell*, 897 F.2d 565, 566 (D.C. Cir. 1990).

The case arose under the Copyright Act of 1976 and involved the infringement of six copyrights, each protecting a distinct pose of either Mickey or Minnie Mouse. The court held that the defendant had only infringed upon two works, Mickey and Minnie, for purposes of assessing statutory damages. *See id.* at 570 ("Mickey is still Mickey whether he is smiling or frowning, running or walking, waving his left hand or his right."). As such, the Court vacated the damages award that "mistakenly focus[ed] on the number of infringements rather than on the number of works infringed." *Id.* at 569.

Although not raised by either party, it is notable that *Disney* was not a summary judgment matter, but instead a case in which Defendant admitted liability. *Walt Disney Co. v. Powell*, 698 F. Supp. 10, 11 (D.D.C. 1988). The other case discussed by Plaintiff to support viewing each copyright as a separate work relates to damages that were awarded after a bench trial. *Columbia Pictures TV, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193 (9th Cir. 2001) (affirming prior decision that each episode of television series was a separate work). The Court has carefully reviewed the case law on this issue, including the life of the *Columbia Pictures* case, with its several appeals. Defendant moves for summary adjudication on this issue, but has failed to meet its burden. The Ninth Circuit has contemplated the existence of instances "in which the issue of what constitutes a 'work' may be a jury question." *Id*. at 1193. Defendant having not carried its burden, this is such a case. The Court denies this aspect of the motion.

//
//
//
//
//
//
//
//

12cv2472

## IV.    CONCLUSION

In conclusion, the motion (Doc. No. 76) is **GRANTED IN PART** and **DENIED IN PART**. The Court is unconvinced that summary judgment is appropriate for the copyright infringement claim, but summary judgment is warranted on the trade dress and the unfair competition claims. Finally, as to damages, the Court grants the unopposed request regarding lost sales, but denies the remainder of the request, for the reasons set forth herein.

**IT IS SO ORDERED.**

DATED:  March 26, 2015

Hon. Anthony J. Battaglia
U.S. District Judge